**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

VICTORIA CARTER,

        Plaintiff,

vs.                                   Case No.  3:12-cv-610-J-39MCR

AT&T CORP. and AT&T UMBRELLA PLAN
NO. 1,

        Defendants.

_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant AT&T Corp.'s Motion for

Summary Judgment (Doc. 27) and Defendant AT&T Umbrella Plan No. 1's Motion for

Summary Judgment or, in the Alternative, Motion for Final Judgment (Doc. 32).  Plaintiff

filed responses in opposition on November 29, 2013.  (Docs. 39 & 38, respectively).

This matter was referred to the undersigned for a Report and Recommendation

regarding the appropriate resolution of the case.  (Doc. 21).

      For the reasons stated herein, it is respectfully recommended that Defendant

AT&T Corp.'s Motion for Summary Judgment (Doc. 27) be **GRANTED**.  It is further

respectfully recommended that Defendant AT&T Umbrella Plan No. 1's Motion (Doc. 32)

be **DENIED** and this matter be remanded to Defendant AT&T Umbrella Plan No. 1 for

---

[1]Any party may file and serve specific, written objections hereto within FOURTEEN (14) DAYS after service of this Report and Recommendation.  Failure to do so shall bar the party from a de novo determination by a district judge of an issue covered herein and from attacking factual findings on appeal.  See 28 U.S.C. § 636(b)(1); Rule 72(b), Fed.R.Civ.P.; and Local Rule 6.02(a), United States District Court for the Middle District of Florida.

further consideration of Plaintiff's short term disability claim.

## I. INTRODUCTION

Plaintiff was employed by an AT&T Corp. affiliate, BellSouth Advertising & Publishing Corp., as a directory advertising sales representative. (AR 228).[2] Plaintiff was a participant in the AT&T Umbrella Benefit Plan No. 1 (the "Plan"), which offered short term disability ("STD") benefits. The Plan is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Sedgwick Claims Management Services, Inc. ("Sedgwick") is the Plan's third party administrator, which operates the AT&T Integrated Disability Services Center ("IDSC"). (Doc. 32-1, Decl. of John D. Adkins, ¶ 8). As claims administrator, Sedgwick had the discretion to interpret the Plan and determine whether a particular employee was entitled to benefits. Id. at ¶ 9.

Plaintiff applied for STD benefits, alleging she could no longer work due to back conditions, anxiety, stress, and depression. (AR 1, 70, 148-50). Plaintiff was approved for STD benefits pursuant to the Plan for the time period October 11, 2010 through January 7, 2011. (AR 278, 439, 539).[3] Plaintiff was denied STD benefits beyond January 8, 2011. (AR 130-33). Plaintiff exhausted her administrative remedies and filed the instant action. (Doc. 1). Plaintiff alleges Defendant AT&T Umbrella Plan No. 1 wrongfully denied her STD benefits. Plaintiff has also brought a claim for retaliation

---

[2] Citations to the Administrative Record are designated "AR" followed by the stamped page number.

[3] Plaintiff was initially granted STD benefits from October 11, 2010 through December 20, 2010. (AR 276-78, 285). On appeal, Plaintiff's STD benefits were reinstated through January 7, 2011, but denied thereafter. (AR 539-40).

against Defendant AT&T Corp., alleging she was wrongfully terminated from employment in retaliation for exercising her rights under the STD Plan.

## II.     STANDARD OF REVIEW

### A.     Summary Judgment Standard

Rule 56 provides that summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Rule 56, Fed.R.Civ.P.; Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 254 (1986).  The Court must view all evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party.  Sierra Club, Inc. v. Leavitt, 488 F.3d 904, 911 (11th Cir. 2007).

"In an ERISA benefit denial case ... in a very real sense, the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Curran v. Kemper Nat. Servs., Inc., No. 04-14097, 2005 WL 894840, at *7 (11th Cir. 2005) (per curiam) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002)); see also Crume v. Met. Life Ins. Co., 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006).  Accordingly, when reviewing a decision for abuse of discretion, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." Crume, 417 F. Supp. 2d at 1272 (quoting Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999)); accord Young v. Bank of Am. Corp. Corporate Benefits Comm., No. 3:06-cv-89-

J-33HTS, 2007 WL 294237, at *4 (M.D. Fla. Jan. 29, 2007); Providence v. Hartford Life & Accident Ins. Co., 357 F. Supp. 2d 1341, 1342 n.1 (M.D. Fla. 2005).

### B.    ERISA Standards of Review

ERISA does not provide a standard to review decisions of a plan administrator or fiduciary in actions challenging benefit determinations under § 1132(a)(1)(B).[4] Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989); Paramore v. Delta Air Lines, 129 F.3d 1446, 1449 (11th Cir. 1997).  In Firestone, the Supreme Court established that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone, 489 U.S. at 115.  When a plan grants the administrator discretionary authority to interpret the terms of the plan and to determine benefits, courts will only reverse an administrator's determination if it is "arbitrary and capricious."  Id.

In Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105 (2008), the Supreme Court clarified that the burden of showing that the defendant's denial of benefits was both wrong and arbitrary and capricious remains on the plaintiff despite any conflict of interest on the defendant's part.  The Glenn Court instructed that the presence of a conflict of interest does not require "a change in the standard of review, say, from deferential to de novo review."  Id. at 115.  Instead, courts should consider a conflict of interest as a factor in determining whether the plan administrator abused its discretion.

---

[4] Section 1132(a)(1)(B) authorizes a "participant or beneficiary" to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"  29 U.S.C. § 1132(a)(1)(B).

Id. at 108.

In Doyle v. Liberty Life Assurance Co., 542 F.3d 1352 (11th Cir. 2008), the Eleventh Circuit recognized that Glenn implicitly overruled prior Eleventh Circuit precedent in which a conflict of interest triggered a heightened arbitrary and capricious standard.  The court stated, "[w]e hold that the existence of a conflict of interest should merely be a factor for the district court  to take into account when determining whether an administrator's decision was arbitrary and capricious."  Id. at 1360.

Nevertheless, after Doyle, the Eleventh Circuit has reiterated the six-step analysis previously set forth in Williams v. Bellsouth Telecommunications, Inc., 373 F.3d 1132, 1137 (11th Cir. 2004).  See Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1195 (11th Cir. 2010).  In short, the steps require the Court to address the following issues:

> 1.   Was the administrator's decision wrong, i.e., does the Court disagree with the decision under a de novo standard of review?
>
> 2.   If the Court disagrees with the administrator's decision, was the administrator vested with discretion under the ERISA Plan in reviewing claims?
>
> 3.   If the administrator had discretion, was its decision arbitrary and capricious, i.e., lacking any reasonable grounds?
>
> 4.   If there were reasonable grounds for the decision, was the administrator acting under a conflict of interest?
>
> 5.   Assuming no conflict of interest, the decision should be affirmed.
>
> 6.   If there was a conflict of interest, review the decision under the heightened arbitrary and capricious standard.

Capone, 592 F.3d at 1195.  The Capone court held that Glenn and Doyle left the Williams "methodology" intact except for the sixth step.  Id. at 1196.  Therefore, this

Court follows that analysis for Defendant AT&T Umbrella Plan No. 1's challenged decision.  It is undisputed that Defendant was vested with discretion in reviewing claims and was not acting under a conflict of interest.  Thus, the Court must assess whether Sedgwick's decision to deny Plaintiff's claim for STD benefits was "wrong"' under the de novo standard, and, if so, whether reasonable grounds nevertheless support Sedgwick's decision such that it must be affirmed.

## III.    BACKGROUND

Plaintiff was employed by an AT&T Corp. affiliate, BellSouth Advertising & Publishing Corp., as a directory advertising sales representative.  (AR 228).  Plaintiff's employment with AT&T was initially successful, and in 2009, Plaintiff received accolades and the honor of President's Club, a company sales award.  (Doc. 28-1 at 30-31).  However, towards the end of 2009, Plaintiff's employment experience with AT&T began to deteriorate, resulting in her filing several grievances against various supervisors and eventually seeking medical leave for anxiety and depression.

Specifically, on December 3, 2009, Plaintiff sought a restraining order against Terry Hartman, the wife of a co-worker, Elliot Hartman, with whom Plaintiff had a relationship that lasted for approximately one year.  (Doc. 29-1, Deposition of Victoria Carter, at 60, 63, 74-75).  Plaintiff then notified Human Resources and her supervisors, James Morris and Matthew Currey, about the restraining order.  On December 31, 2009, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on sex and claiming she was subjected to "constant criticism, micromanagement, and intense scrutiny" and a "hostile work environment" by Mr. Morris and Mr. Currey after she notified them about the

restraining order.  (Doc. 28-4 at 30-31).[5]  On January 6, 2010, Plaintiff filed a complaint

with Human Resources, alleging similar claims against Mr. Morris and Mr. Currey.  Id.

25-29.[6]  On February 19, 2010, Plaintiff filed a grievance against Mr. Morris through the

Union alleging a hostile work environment.  Id. at 32.  Plaintiff also filed grievances

against Mr. Morris on March 1, 2010 and May 21, 2010.  Id. at 33-36.  All three

grievances filed with the Union were resolved in Plaintiff's favor.  (Doc. 28-10 at 59-68).

Thereafter, Plaintiff was supervised by Amy Topnick on a campaign for Palatka,

Florida that lasted from June to July of 2010.  (Doc. 29-1, Deposition of Victoria Carter,

at 29-30).  While working on the Palatka campaign, Plaintiff started suffering from

backaches, panic attacks, migraines, and anxiety.  Id. at 168.  Plaintiff alleges these

symptoms were caused by the hostile treatment she received from her supervisors at

work.  In August 2010, Plaintiff began reporting to Al Miller for a campaign for

Gainesville, Florida.  Id. at 30-31.

Plaintiff last attended work at AT&T on October 4, 2010.  On October 7, 2010,

Plaintiff's psychiatrist, Dr. Anjali A. Pathak, M.D., submitted a note stating Plaintiff

should take short term disability until November 1, 2010.  (AR 141).  Plaintiff was absent

from work due to disability on October 11, 2010, at which point Sedgwick began

processing her claim for short-term disability benefits.  (AR 79, 278).

On October 18, 2010, Dr. Perry G. Carlos, D.O. completed an Attending

Physician Statement supplied by Sedgwick. (AR 163-67).  The form defined "disability"

---

[5] The EEOC issued a Dismissal and Notice of Suit Rights on May 13, 2011 (Doc. 28-10 at 80).

[6] The HR complaint was closed as unsubstantiated on January 27, 2010 (Doc. 28-4 at 25).

as "a medical condition which makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury." (AR 163). Dr. Carlos diagnosed major depressive disorder and major anxiety disorder, prescribed anti-depressant medication, and indicated Plaintiff was to follow up with a psychiatrist and therapist. Id. Under "return-to-work status," Dr. Carlos indicated he was "unable to formulate a release," but Dr. Carlos opined Plaintiff was "unable to work at this time" and provided a projected return-to-work date of November 30, 2010. Id.

Dr. Carlos also completed a Behavioral Health Clinician Statement supplied by Sedgwick. (AR 166). The form included the following definition of "disability":

> Disability Definition: A medical condition which makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury. "Any type of work" includes the Participant's regular job with or without accommodations, any other Participating Company job (regardless of availability) with or without accommodations, or temporary modified duties. "A Participating Company Job" is any job within a Participating Company; or any job outside a Participating Company which is comparable in skills and functions.

Id. Under the section titled "Claimant's current disability plan must indicate," Dr. Carlos checked the boxes for both "inability to perform essential duties of his/her own job" and "inability to perform essential duties of any job." Id. Dr. Carlos identified Plaintiff's occupation as "sales/marketing." Id. Dr. Carlos stated he recommended Plaintiff stay home from work on October 4, 2010. Id.

On October 22, 2010, Dr. Anjali Pathak submitted an Attending Physician Statement in which he indicated Plaintiff was currently being seen for psychotherapy and counseling every week. (AR 178). He diagnosed major depressive disorder and indicated a guarded anticipation "return-to-work" status of December 2010. Id. Dr.

Pathak also completed a Behavioral Health Clinician Statement.  (AR 13).  Under the section "Claimant's current disability plan must indicate," Dr. Pathak checked the box for "inability to perform essential duties of any job."  Id.  Dr. Pathak indicated he recommended Plaintiff stay home from work because Plaintiff endorsed an inability to perform.  Id.  Dr. Pathak opined Plaintiff was "unable to work at this time" and provided a projected return-to-work date of December 5, 2010.  Id.

On November 1, 2010, Plaintiff's short term disability was approved from October 11, 2010 through November 10, 2010.  (AR 192, 199).  Plaintiff was directed to provide updated medical documentation by November 10, 2010.  (AR 199).

On November 8, 2010, Dr. Carlos submitted a letter, which indicated Plaintiff was last seen in his office on November 5, 2010 for persistent anxiety with depression, upper back pain, and recurrent headaches.  (AR 210).  He opined Plaintiff "[was] unable to return to work at this time."  Id.

On November 9, 2010, licensed clinical social worker, Lynda Mance, completed a Behavioral Health Clinician Statement.  (AR 212-13).  Under the section "Claimant's current disability plan must indicate," Ms. Mance checked the boxes for both "inability to perform essential duties of his/her own job" and "inability to perform essential duties of any job."  (AR 212).  Ms. Mance identified Plaintiff's occupation as "advertising sales." Id.  Ms. Mance recommended Plaintiff stay home from work because Plaintiff "need[ed] to stabilize."  Id.  Ms. Mance indicated Plaintiff was to attend outpatient psychotherapy once a week and would be on medication management to include Trazodone, Zoloft, Mobic, and Lorazepam.  (AR 213).  Ms. Mance opined Plaintiff was "unable to work at this time" and provided a projected return-to-work date of December 13, 2010.  Id.

On November 11, 2010, Sedgwick notified Plaintiff by letter that her claim for disability benefits was administratively denied. The letter stated that "effective November 11, 2010 the medical evidence submitted does not support disability from any type of work, including modified duties." (AR 227). Plaintiff was directed to return to work on November 14, 2010. (AR 220). Plaintiff was informed that if she chose not to return to work, continued benefit payments would be paid contingent upon the results of an Independent Medical Exam ("IME"). (AR 227). On November 15, 2010, Sedgwick directed Plaintiff to attend an IME with Dr. Richard E. Nay on November 29, 2010. (AR 235-36).

On November 17, 2010, Plaintiff was approved for an intensive outpatient program ("IOP") at Wekiva Springs from November 17, 2010 to December 7, 2010. (AR 262). On November 19, 2010, Dr. Pathak completed a Mental Health Provider Statement. (AR 254-58). Dr. Pathak indicated Plaintiff's current level of treatment involved participation in an intensive outpatient program ("IOP") at Wekiva Springs for four hours a day, five days a week, as well as medication management and therapy. (AR 257). Dr. Pathak reported the plan was for Plaintiff to continue with the IOP with return to work on December 10, 2010 for half days. Id.

On November 29, 2010, Plaintiff attended the IME scheduled by Sedgwick with Dr. Richard Nay, Ph.D., a licensed psychologist. (AR 265-72). Dr. Nay opined Plaintiff "endorsed symptoms and psychological problems in a manner which [was] highly consistent with individuals honestly reporting their difficulties" and "[n]o evidence of exaggeration or feigning was found." (AR 270). Examination findings indicated the presence of "mild-moderate difficulties with concentration and short-term memory, even

delayed memory, although to a lesser extent." <u>Id.</u> Dr. Nay stated these findings were corroborated throughout the medical records from Dr. Carlos, Ms. Mance, and Dr. Pathak.  (AR 270-71).

Dr. Nay opined work accommodations would be appropriate for "whenever [Plaintiff was] expected to return to work" and suggested a graduated return to work schedule be initiated, consisting of Plaintiff returning to work on a half-time basis and then graduating to full-time within two to three weeks, with ongoing psychiatric and psychological intervention.  (AR 271).  Dr. Nay further suggested Plaintiff's level and intensity of social interaction be minimized initially, with graduated increasing exposure to intense social situations occurring over a four week time frame.  <u>Id.</u>  Dr. Nay stated it would be helpful if Plaintiff's initial sales productivity quota be reduced and increased in a gradual manner over a period of four weeks and he believed Plaintiff should be given the opportunity to take "stress breaks" as needed.  <u>Id.</u>  Finally, to account for Plaintiff's difficulty with concentration and short-term/delayed memory, important information should be given to her in written form, with minimal expectations of memorization of large amounts of information.  <u>Id.</u>  Dr. Nay believed a return to work date of December 13, 2010 was a "reasonable expectation" given the accommodations suggested.  <u>Id.</u> Dr. Nay opined Plaintiff did not exhibit a lack of motivation to return to work but she was concerned that "her emotional/behavioral symptoms would impede her ability to meet her self-imposed high standards of job performance."  (AR 272).

On December 1, 2010, Dr. Pathak submitted a request to extend Plaintiff's disability leave until December 21, 2010, in order for her to complete the intensive outpatient program at Wekiva Springs.  (AR 264).

On December 16, 2010, Plaintiff was approved for continuing short term disability benefits through December 20, 2010.  (AR 276-78, 285).  Plaintiff was directed to provide updated medical documentation by December 21, 2010.  (AR 285).  To that end, on December 20, 2010, Dr. Pathak submitted a Mental Health Provider Statement. (AR 289-90).  Dr. Pathak reported Plaintiff was still participating in the IOP at Wekiva with an unknown date of discharge.  (AR 289).  Dr. Pathak stated Plaintiff "appeared capable of part time work," however, Plaintiff stated she could not work at that time. (AR 290).  Dr. Pathak stated his office was no longer writing a return to work plan and Dr. Groble, Plaintiff's new psychiatrist, should be contacted for that plan.  Id.

On December 21, 2010, Sedgwick notified Plaintiff by letter that her claim for disability benefits was administratively denied effective December 21, 2010.  (AR 291-93, 303).  The letter stated "the medical evidence submitted does not support disability from any type of work, including modified duties." (AR 303).   Plaintiff was directed to return to work on December 24, 2010.  Id.  Plaintiff was again instructed that if she chose not to return to work, continued benefit payments would be paid contingent upon the results of an IME.  Id.

A December 21, 2010 treatment note from licensed clinical social worker, Lynda Mance, indicated Plaintiff reported her attendance at the Wekiva Springs IOP was "somewhat helpful." (AR 418).  Ms. Mance suggested Plaintiff remain off work until the middle of January, "to give the medication time to get to a therapeutic dose and to work on coping strategies."  Id.

On December 22, 2010, licensed clinical social worker, Marian Turner-Sharpton, submitted a letter on Plaintiff's behalf.  (AR 298-99).  Ms. Turner-Sharpton noted

Plaintiff's job "require[d] extensive driving and interacting with people, which [Plaintiff was] not yet able to resume." (AR 298). Ms. Turner-Sharpton opined Plaintiff was "emotionally unable to return to a stressful and emotionally toxic work environment at this time. She is not able to return to work at this time on a part time or full time basis." Id.

On December 29, 2010, Dr. Groble submitted to Sedgwick a Behavioral Health Clinician Statement dated December 16, 2010. (AR 308-309). Under the section titled "Claimant's current disability plan must indicate," Dr. Groble checked the boxes for both "inability to perform essential duties of his/her own job" and "inability to perform essential duties of any job." (AR 308). Dr. Groble identified Plaintiff's occupation as a "salesperson for AT&T." Id. Dr. Groble indicated he had recommended Plaintiff stay home from work on December 16, 2010. Id. Dr. Groble opined Plaintiff was "unable to work at this time" and provided a projected return-to-work date of March 5, 2011. (AR 309).

On January 4, 2011, Sedgwick notified Plaintiff that her short term disability claim had again been administratively denied. (AR 318). She was directed to attend an IME on January 10, 2011 with psychologist, Dr. Alan J. Harris. (AR 317).

On January 5, 2010, licensed mental health counselor, Jodi Wilkinson, the outpatient coordinator at Wekiva Springs, submitted a Mental Health Provider Statement. (AR 326-27). Ms. Wilkinson reported Plaintiff was still attending the intensive outpatient program at Wekiva Springs Monday through Friday for three hours each day. (AR 326). Ms. Wilkinson opined Plaintiff was unable to work at that time because she was currently in treatment Monday through Friday and therefore, Plaintiff's

return to work plan was undetermined.  (AR 327).

Plaintiff was discharged from the intensive outpatient program at Wekiva Springs on January 7, 2011.  (AR 361).  In the discharge summary, Ms. Wilkinson reported that Plaintiff's attitude was good and she showed "a desire to work on her issues."  Id.  Ms. Wilkinson described treatment findings as "moderate" and stated Plaintiff's response to treatment was "positive."  Id.  Plaintiff's prognosis was "good due to patient having an aftercare plan in place."  Id.

On January 7, 2011, Plaintiff filed a complaint with Human Resources, alleging her supervisors had engaged in "inappropriate conversations" regarding her disability leave.  (Doc. 28-5 at 16-19).  Specifically, Plaintiff alleged Amy Topnick commented to another employee that she hoped Plaintiff did not return to work.  Id. at 17.[7]

Plaintiff attended the independent examination with Dr. Alan J. Harris, Ph.D. scheduled by Sedgwick on January 10, 2011 and January 11, 2011.  Dr. Harris submitted a report dated January 12, 2011.  (AR 328-36).

Dr. Harris diagnosed major depressive disorder by history and anxiety disorder not otherwise specified with panic attacks.  (AR 335).  Dr. Harris concluded:

> Since the perceived cause of her distress is the way she is treated by management at AT&T, this individual should be able to work in a different environment with a different employer.  It is likely, however, should she return to work in the same position at AT&T, she would experience severe emotional stress, as her perceptions of how she was treated have not changed.  Thus, it would be reasonable if the same managers were in place that she would anticipate the same treatment. Unless disciplinary action is taken against all three identified

---

[7] On February 9, 2011, the complaint was closed after an investigation was completed "with no allegations being substantiated."  Id. at 16.

-14-

managers (which is unlikely), and AT&T supports her grievances, it appears unlikely that she would feel comfortable returning to work no matter how much treatment she receives. In my professional opinion, she has overstated her problems as she is afraid of returning to the traumatic situation, which triggered her decline.

Id.

On January 21, 2011, disability specialist, Barbara Kelly, notified Plaintiff that her short term disability benefits had been denied for the period beginning December 24, 2010 through return to work. (AR 339-45). The letter stated the decision to deny benefits was based on a review of the medical documentation provided by Wekiva Springs on January 5, 2010 and Dr. Groble on December 29, 2010 and explained that "[t]he medical information did not support that you continued to be unable to perform any work activity in any occupation." (AR 344-45). The letter further explained, because the IME report "did not support that you were unable to work in any capacity therefore, your short term disability claim has been denied from December 24, 2010 through your return to work." Id. Plaintiff was notified that her disability absence was without approval and she should contact her supervisor regarding her intentions for returning to work. Id. Attached to the denial letter was an exhibit titled, "AT&T Southeast Application for Extension of STD Appeal Leave of Absence" ("Application for Extension"). (AR 424). The Application for Extension informed Plaintiff that she was eligible to apply for a STD Appeal Leave of Absence, which would permit her to receive unpaid leave to allow her to complete the appeal process for denial of STD benefits and to remain on the company payroll until resolution, for a maximum of 450 consecutive days. Id. Plaintiff was informed that she must apply for STD Appeal Leave of Absence

-15-

via certified mail within twenty days of January 21, 2011.  Id.

On February 8, 2011, Plaintiff's STD appeal leave of absence request was approved for the period December 24, 2010 through August 30, 2011.  (Doc. 28-10 at 72-73).  An e-mail to Plaintiff explained that the STD appeal leave of absence was "unpaid leave that protects the employee's job and allows them to remain on the company payroll to complete the appeal process for their denied short-term disability benefits as determined by the AT&T Integrated Disability Service Center."  Id. at 73. The e-mail further explained that the leave would end once a decision was made on the first appeal and if Plaintiff was still unable to return to work and wished to be covered by unpaid leave of absence, she "must mail Exhibit A2 (Application for Extension of STD Appeal LOA) that will be included in the correspondence from the IDSC when the appeal decision is rendered."  Id.

On March 23, 2011, Plaintiff submitted an appeal of the denial of her claim (AR 428-39).  On June 15, 2011, Dr. Groble submitted a letter on Plaintiff's behalf.  (AR 460).  He stated Plaintiff had been a patient of his since December 16, 2010 and she was "unable to work at this time due to her condition."  Id.

On July 14, 2011, Dr. Paul Giannandrea, M.D. submitted an independent review of the medical record.  (AR 528-32).  Dr. Giannandrea opined "from a psychiatric perspective," that Plaintiff was "not disabled from any type of work (any occupation) as of 01/08/11 through present."  (AR 531).  Dr. Giannandrea noted, "after her discharge from the intensive outpatient program on January 7, 2011, there [was] very little documentation to indicate ongoing disability condition, especially for any employment." Id.  Dr. Giannandrea stated Plaintiff was not precluded "from returning to any work, but

just the position that she had left given her perspective and focus of attention." Id. Dr. Giannndrea concluded the documentation provided did not support the disabling psychiatric condition that would preclude Plaintiff from "any occupation." Id.

On July 28, 2011, Plaintiff's STD appeal leave of absence was extended through September 15, 2011 to allow additional time for the decision of her first appeal of the denial of her STD benefits. (Doc. 28-4 at 37, 39). Plaintiff was notified in an e-mail that she had the "responsibility to mail a new LOA Application . . . once the appeal decision is made." Id. Leave of Absence Administrator, Stacy Korzekwa, wrote, "[i]f any portion of your disability benefit is still denied, they will include another LOA application titled Exhibit A2: Application for Extension of STD Appeal Leave of Absence. You have 20 days from the date of that letter to mail me the new LOA Application if you want to remain on the STD Appeal LOA while you complete your 2nd appeal. I would process the application and give you the remaining balance (up to 450 days) for the leave." Id.

On August 5, 2011, Sedgwick sent Plaintiff an Appeal Disability Benefit Reinstatement Notice, which indicated Plaintiff's disability benefits had been reinstated from October 11, 2010 through January 7, 2011, but were denied from January 8, 2011 through return to work. (AR 534, 539-40). The letter explained benefits were reinstated from December 24, 2010 through January 7, 2011 due to Plaintiff's participation in the intensive outpatient program during that time; however, an independent physician advisor had reviewed the file and the documented findings were not "so severe as to prevent [Plaintiff] from performing any type of work from January 8, 2011 through present." (AR 540). Attached to the denial letter was another Application for Extension. (AR 542). The Application for Extension again informed Plaintiff she had twenty days

from August 5, 2011 to submit an application to extend her STD Appeal Leave of

Absence.  Id.  The form stated, "Failure to return this application will result in the denial

of the remainder of your leave period and if you don't apply for reinstatement to your

department (verbally or in writing) within 10 calendar days, you will be terminated from

the payroll and will forfeit your reinstatement rights . . . ."  Id.

　　　Plaintiff failed to submit a new application for leave of absence pending her

second appeal within the deadline.  (Doc. 29-1, Deposition of Victoria Carter, at 177-

80).  However, on September 7, 2011, Plaintiff submitted via certified mail a completed

Application for Extension dated September 6, 2011.  (Doc. 28-5 at 1-3).  In an

accompanying letter, Plaintiff wrote, "I understand that I have missed the deadline of 20

days from August 5, 2011 when my attorney and I received the Exhibit A2 notice."  Id. at

3.  Plaintiff stated she counted on her attorney to handle her leave of absence request,

but he had failed to take care of it.  Id.  Plaintiff requested she be granted additional

leave of absence time.  Id.

　　　On September 8, 2011, Plaintiff's attorney, Erik W. Berger, submitted an appeal

of the decision denying her claim for benefits.  (AR 550).  That same day, Ms.

Korzekwa, the leave of absence administrator, contacted Plaintiff's supervisor, Al Miller,

to inform him that Plaintiff's leave was not extended beyond September 15, 2011

because she had not mailed the leave of absence extension application within the

twenty-day deadline and therefore, "no additional time can be granted."  (Doc. 28-10 at

82).

　　　Mr. Miller sent Plaintiff a letter dated September 14, 2011 in which he stated he

had been advised that her leave would not be extended beyond September 15, 2011.

(Doc. 28-6 at 12).  Mr. Miller informed Plaintiff that "[f]ailure to return back to work by Monday, September 19, 2011, may result in disciplinary action up to and including termination."  Id.

On September 16, 2011, Plaintiff submitted a letter to Sedgwick requesting "extra time for my leave of absence for I inadvertently missed the original deadline while my disability appeal is pending."  (AR 554).  Plaintiff appended a "Certificate of Disability" signed by Dr. Groble on September 15, 2011.  (AR 557).  In the certificate, Dr. Groble stated Plaintiff had not recovered sufficiently to be able to return to full work duties, as she was "unable to travel outside of community or be away overnight, unable [to] tolerate stress, [and] unable [to] comprehend and follow instructions."  Id.  Dr. Groble indicated Plaintiff's next appointment was scheduled for September 29, 2011, and her return to work was anticipated by December 31, 2011.  Id.

In an e-mail dated September 16, 2011, Ms. Korzekwa informed Plaintiff that her request for leave of absence was denied because the leave of absence application was not postmarked within twenty days of the date of the Denial Uphold Letter.  (Doc. 28-5 at 4-5).  Ms. Korzekwa explained "I cannot grant any additional LOA time since the form wasn't mailed timely" and notified Plaintiff that her STD appeal leave ended effective September 15, 2011.  Id. at 4.

On September 20, 2011, Plaintiff filed a Charge of Discrimination with the Florida Commission on Human Relations, alleging unlawful retaliation.  (Doc. 28-2 at 9-10; Doc. 28-8 at 17).  Specifically, Plaintiff alleged she was subjected to a "campaign of retaliatory harassment" after filing her December 31, 2009 EEOC Charge of Discrimination and lodging internal complaints with AT&T's human resources

department.  Id.[8]

In a letter dated September 28, 2011, Plaintiff's supervisor, Al Miller, informed

Plaintiff that she had been terminated from employment with AT&T Advertising

Solutions effective September 19, 2011.  (Doc. 28-6 at 13-14).  On October 3, 2011,

Sedgwick received notification that Plaintiff's employment had been terminated effective

September 19, 2011 for "[m]isconduct consisting of unexcused absence (i.e. failure to

substantiate or provide medical information regarding her absence and failure to return

to work)." (AR 571; Doc. 28-6 at 14).

On December 5, 2011, Dr. William Samuel Cook, Jr., M.D. submitted an

independent review of the medical record.  (AR 836-41).  Dr. Cook responded "no" to

the question of whether "the employee [was] disabled from any job as of 1/08/2011

through present?"  (AR 840).  Dr. Cook opined, "The clinical documentation provided

lacks evidence upon examinations from January 8, 2011 with psychological objective

signs and symptoms to indicate that the patient had severe depression or anxiety that

would disable the patient from any job as of 01/08/2011 through present."  Id.  Dr. Cook

noted it was reported Plaintiff would be able to return to work in a different environment

with a different employer, and "although she presented with numerous psychiatric

symptoms when she started on disability, it was questionable whether she continues to

have the symptoms with [the] frequency and severity she claims."  Id.  Dr. Cook

---

[8] On February 27, 2012, the Florida Commission on Human Relations ("FCHR") issued a "no cause" determination.  On March 29, 2012, Plaintiff filed a Petition for Relief with FCHR (Doc. 28-11 at 20-27) and an administrative hearing was held on October 24, 2012.  (see Transcript of Proceedings at Doc. 28-1 through Doc. 28-3).  FCHR issued a dismissal on May 8, 2013.  Plaintiff appealed the dismissal to Florida's First District Court of Appeal and the appeal is currently pending before the state court.

concluded "clinical findings in the medical records would indicate that the patient would have the ability to function at any job." Id.

On December 22, 2011, Dr. Groble submitted a letter on Plaintiff's behalf in which he reported Plaintiff had been his patient since her initial psychiatric evaluation, when she presented with chief complaints of depression, anxiety and intermittent panic attacks. (AR 897). Dr. Groble noted that Plaintiff was placed on short term disability by her primary care physician and referred to an intensive outpatient program. Id. Dr. Groble stated the loss of disability benefits led Plaintiff to become "even more dysfunctional in managing her life." (AR 898). Dr. Groble reported Plaintiff had experienced significantly decreased subjective ability to concentrate and function in her work, and continually worried about potential harassment or loss of her employment position. Id. Dr. Groble found Plaintiff "was unable to sustain previous pace of work and no longer is functioning nearly as effectively [sic] in her position with AT&T that requires sales of AT&T products." Id. Dr. Groble noted Plaintiff's symptoms "ha[d] been minimally improved by the psychotropic medications or counseling," however, Dr. Groble opined Plaintiff "remain[ed] disabled psychiatrically unable to function in a consistent manner in any kind of gainful employment." (AR 899). He stated she "ha[d] difficulty [] driving in this community, further limiting her ability to obtain and sustain employment with the extent of recluse hallucinations; she continue[d] to be seen as vocationally incapacitated and incapable of functioning vocationally in a responsible position." Id. Dr. Groble concluded, "[g]iven the severity of [Plaintiff's] emotional symptoms and their effects on her ability to function, she must be considered to be disabled and this inability to sustain work functioning can be expected to last

indefinitely." Id.

On January 6, 2012, Dr. Fazila Siddiqi, M.D. reviewed progress notes from Dr. Groble dated December 16, 2010 through December 22, 2011.  (AR 120-22).  Dr. Siddiqi noted he had previously been asked: "Is the employee disabled from any job as of 1/08/11 through present?" and the additional information did not alter his previous determination.  (AR 121).  Dr. Siddiqi opined the treatment provider provided a mental status examination and objective findings which did not support the severity of impairment with significant limitation of functioning as of January 8, 2011 through the present. Id. Dr. Siddiqi explained that Plaintiff had only seen Dr. Groble once a month and his notes left the mental status examination blank and only included subjective complaints. Id.

On January 27, 2012, Sedgwick notified Plaintiff that her disability benefits had been denied from January 8, 2011 through the present.  (AR 130-33).  In a letter to Plaintiff's attorney, the appeals specialist explained that Drs. Cook and Siddiqi had reviewed the medical records as part of the appeal process and concluded "from a psychiatric perspective, there was [a] lack of evidence of psychological signs and symptoms that supported [a finding Plaintiff] was disabled from performing any job during the period under review."  (AR 135).  The letter concluded, none of the findings "are documented to be so severe as to prevent [Plaintiff] from performing any type of work from January 8, 2011 through present." Id.

## IV.     PLAINTIFF'S CLAIM FOR FAILURE TO PAY BENEFITS

### A.     The Short Term Disability Plan

Terms in ERISA plans should be defined consistently with the specific definitions

provided in the policy.  <u>Brown v. Blue Cross and Blue Shield of Ala., Inc.</u>, 898 F.2d 1556, 1571 n.17 (11th Cir. 1990).  Plan administrators must "adopt interpretations of plan provisions that are consistent with the written terms of the plan."  <u>Id.</u>  Terms that are not defined specifically by the plan are interpreted according to their "plain and natural" meanings.  <u>Bedinghaus v. Modern Graphic Arts</u>, 15 F.3d 1027, 1029-30 (11th Cir. 1994).

Here, the Plan defines "disability" as "a medical condition supported by objective medical evidence, which (i) makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury."  (Doc. 32-2 at 5).  "Any type of work" is defined as the following "regardless of availability": "(a) the Participant's regular job with or without accommodations, (b) any other Participating Company job with or without accommodations, or (c) temporary modified duties."  <u>Id.</u>  "A Participating Company job" is defined as "any job within a Participating Company; or any job outside a Participating Company which is comparable in skills and functions."  <u>Id.</u>

Accordingly, under the express terms of the plan, "any type of work" means work that falls into one of three categories: (1) the participant's regular job, with or without accommodations; (2) a job comparable in skills and functions to the participant's regular job with or without accommodations; or (3) temporary modified duties.  <u>See Carey v. Bellsouth Short Term Disability Plan</u>, No. 1:06-cv-2589-WSD, 2008 WL 178714, at *8 (N.D. Ga. Jan. 17, 2008) (construing identical language as such and rejecting defendant's argument that the terms of the plan mean "any work of any kind whatsoever"); <u>Driggers v. Bellsouth Corp.</u>, No. 06-0888, 2008 WL 294603, at *1 (W.D. La. Jan. 31, 2008) (same).

### B.      Application to Plaintiff's Claim

Upon consideration of the administrative record, the undersigned concludes this matter must be remanded to Defendant AT&T Umbrella Plan No. 1 for reassessment of Plaintiff's STD claim because Sedgwick did not undertake the appropriate inquiry for determining whether Plaintiff was entitled to disability benefits.  The Plan requires that a short-term disability benefits recipient be unable to perform her regular job with or without accommodations, a job comparable in skills and functions to the participant's regular job with or without accommodations, or temporary modified duties.  In the present case, the administrative record does not contain a description of Plaintiff's duties as a directory advertising sales representative, let alone an analysis of whether Plaintiff could perform those duties.[9]  There is no discussion of the skills and functions required of Plaintiff's job or her ability or inability to perform those skills and functions.  Rather, the record suggests Sedgwick reviewed Plaintiff's claim under the much broader "any job" or "any occupation" standard of disability, which is inconsistent with the Plan's definition of disability.  For example, a note in the claim file dated October 8, 2010 indicates, "Claims without medical information supporting a complete inability to perform <u>any occupation</u> by the medical due date will be denied."  (AR 4).  Plaintiff's attending physicians who completed Sedgwick's forms checked the box reflecting Plaintiff's disability plan must indicate "inability to perform essential duties of <u>any job</u>."

_____

[9] AT&T's internal description of the job duties and basic qualifications for a directory advertising sales representative was provided at the Florida Commission on Human Relations administrative hearing held on October 24, 2012.  (<u>See</u> Doc. 28-8 at 7).  However, this description does not appear in the administrative record compiled by Sedgwick and there is no evidence this description or any other was provided to the medical experts who reviewed the record or examined Plaintiff.

(AR 13, 166, 212).  The January 21, 2011 denial letter from Sedgwick informed Plaintiff that "[t]he medical information did not support that you continued to be unable to perform <u>any work activity in any occupation</u>."  (AR 345).  The letter further explained, because the IME report "did not support that you were <u>unable to work in any capacity</u> therefore, your short term disability claim has been denied from December 24, 2010 through your return to work."  <u>Id.</u>  Similarly, the August 5, 2011 denial letter from Sedgwick relied upon Dr. Giannandrea's determination that Plaintiff was not disabled from "<u>any type of work (any occupation)</u>" and "<u>any employment</u>" as of January 8, 2011. (AR 345, 540).  Finally, the January 27, 2012 denial letter from Sedgwick relied upon Drs. Cook, Siddiqi and Cohen's conclusions that Plaintiff was not disabled from "<u>any job</u>."  (AR 135).

It is also unclear whether any of the independent medical examiners who reviewed the record or examined Plaintiff considered the specific skills and functions of Plaintiff's job.  <u>See</u> <u>Elliott v. Metropolitan Life Ins. Co.</u>, 473 F.3d 613, 619 (6th Cir. 2006) (noting that a physician never discussed a claimant's job duties when determining her condition did not preclude her from working, "which implies that he did not conduct a reasoned evaluation of her condition to determine whether she could perform those duties"); <u>Allen v. AT&T Disability Income Program</u>, No. 3:08-cv-884, 2009 WL 2366418, at *7-8 (M.D. Tenn. July 29, 2009) (finding doctor's conclusion that plaintiff did not suffer from "'significant functional impairment, that would preclude her ability to perform her own occupation' lack[ed] persuasive force without some indication that [the doctor] considered the specific requirements of [plaintiff's] occupation").  The peer reviewers and medical examiners who submitted the opinions relied upon by Sedgwick variously

concluded there was insufficient evidence to establish that Plaintiff was unable to perform "any job" or "any occupation."  However, this is simply not the determination called for by the Plan.  To deny benefits, Sedgwick was required to find that Plaintiff had not provided objective medical evidence showing that she was unable to perform her own job, a comparable job, or temporary modified duties, with or without accommodation.  See Carey, 2008 WL 178714, at *9.  While these categories are broad, they are not as broad as the "any job" or "any occupation" standard Sedgwick appears to have relied upon in making its determination.  Despite the numerous medical evaluations and reviews that took place in this case, Sedgwick did not rely on application of the relevant evidence to the correct definition of "disability" provided by the Plan when it denied Plaintiff's claim.  See Allen, 2009 WL 2366418, at *9 ("Sedgwick's conclusion that the medical information it received did not establish [the plaintiff's] inability to perform her job as an area manager of circuit provisioning was arbitrary because it did not take into consideration any of the required functions of [the plaintiff's] job.").

"Where an administrator applies or uses an incorrect definition of an ERISA plan term the proper course is generally to remand the matter to the administrator."  Barlow v. Sun Life & Health Ins. Co., 488 F. App'x 458, 459 (11th Cir. 2012).  Under the circumstances of this case, the undersigned finds remand is appropriate for consideration in the first instance as to whether Plaintiff's condition renders her unable to perform her regular job with or without accommodations, a job comparable in skills and functions to Plaintiff's regular job with or without accommodations, or temporary

modified duties.[10]  See id. (remanding where review of the record revealed multiple instances of the plan administrator and the medical experts using an incorrect definition of "regular occupation," it was unclear as to what "occupation" was applied to claimant, and it was unclear as to what, if any, job description or vocational information was provided to medical experts); Elliott, 473 F.3d at 622-23 (finding remand to claims administrator appropriate where medical evidence was not analyzed in relation to claimant's ability to perform her occupation); Hall v. Hewlett-Packard Co., No. 6:12-cv-330-Orl-28KRS, 2013 WL 2447951, at *11-12 (M.D. Fla. June 5, 2013) (remanding to claims administrator because it was "not possible to assess Sedgwick's assessment of Plaintiff's capabilities without knowing what Sedgwick regarded as Plaintiff's 'Own Occupation' or how Sedgwick defined that occupation," and directing defendant to determine the "material and essential duties" of plaintiff's "Own Occupation" before comparing those duties to the plaintiff's capabilities during the relevant time frame); Carey, 2008 WL 178714, at *9 (remanding to defendant for purposes of "developing a complete factual record on the issue of whether [the plaintiff] was capable of performing her own job, with or without accommodations, a comparable job, with or without accommodations, or temporary modified duties; and applying the proper standard for

---

[10] The undersigned does not find Dr. Harris's conclusion that Plaintiff "should be able to work in a different environment with a different employer" to be sufficient to show that reasonable grounds support Sedgwick's decision to deny Plaintiff's claim for STD benefits.  Dr. Harris did not specifically discuss the skills and functions required of Plaintiff's job in relation to her ability to perform those skills and functions, and it is not clear that he was given such information. Additionally, mere reference to Plaintiff's ability to work in "a different environment with a different employer" is too vague to establish that Plaintiff is capable of performing a job that is comparable in skills and functions to her regular job.  Additionally, Dr. Harris's opinion is in contradiction to those of Dr. Groble, Plaintiff's treating psychiatrist, whose opinions at least reference specific skills and functions associated with Plaintiff's job.  For example, Dr. Groble opined Plaintiff was unable to travel or to comprehend and follow instructions.  (AR 557).

'disability' . . . to an adequate administrative record to determine whether [the plaintiff] is entitled to STD (or LTD) benefits").

## V.    PLAINTIFF'S CLAIM FOR RETALIATION

Section 510 of ERISA provides that it is "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled." 29 U.S.C. § 1140. Thus, an employer may not retaliate against or interfere with an employee's attempts to exercise her rights under the relevant plan.

When alleging unlawful retaliation pursuant to § 510, a plaintiff establishes a *prima facie* case of retaliation by showing (1) she is entitled to ERISA's protection; (2) she was qualified for the position; and (3) she was discharged under circumstances that give rise to an inference of discrimination. Wolf v. Coca-Cola Co., 200 F.3d 1337, 1343 (11th Cir. 2000) (quoting Gitlitz v. Compagnie Nationale Air France, 129 F.3d 554, 559 (11th Cir. 1997)).

When a plaintiff relies on circumstantial evidence to prove a violation of § 510 of ERISA, the Court uses the traditional burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973). Under this framework, the plaintiff must raise an inference of discrimination by establishing a *prima facie* case of discrimination. Id. at 802. The burden then shifts to the defendant to "articulate some legitimate nondiscriminatory reason" for the alleged discrimination. Id. Once the defendant produces such a reason, the plaintiff must then prove that the legitimate

-28-

reason was a mere pretext for discrimination.  Id. at 804.

"The ultimate inquiry in a § 510 case is whether the employer had the specific intent to interfere with the employee's ERISA rights."  Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1222 (11th Cir. 1993).  "A plaintiff is not required to prove that interference with ERISA rights was the sole reason for the discharge but must show more than the incidental loss of benefits as a result of a discharge."  Id. at 1222-23 (citing Seaman v. Arvida Realty Sales, 985 F.2d 543, 546 (11th Cir. 1993)).  "[T]he employee must introduce evidence suggesting that the employer's decision was directed at ERISA rights in particular.  Id. at 1224.

Here, Plaintiff has not pointed to any evidence that suggests her termination was motivated by AT&T Corp.'s desire to retaliate against her for requesting ERISA benefits. The record shows Leave of Absence Administrator, Stacy Korzekwa, fully explained the policies for requesting leave of absence pending appeal and Plaintiff was provided ample opportunity to request such leave.  The evidence also shows Plaintiff was aware of the policies for requesting leave and that she was required to request leave of absence within twenty days of the date on the denial letter.  It is undisputed that Plaintiff failed to timely request leave of absence pending her second appeal and that she was then given the option to return to work.  Plaintiff did not return to work and was terminated for unexcused absence.  That Defendant followed its stated policy of requiring her to return to work after her failure to timely request leave of absence does not evidence retaliatory intent.  Plaintiff has not shown AT&T Corp. had the specific intent to discharge her for filing a claim for STD benefits or to interfere with the attainment of any right to which she might become entitled.  Thus, Plaintiff has not

established a *prima facie* case of retaliation under § 510. See Godfrey v. BellSouth Telecomm., Inc., 89 F.3d 755, 759 (11th Cir. 1996) ("Of course an employer may demand that an employee return to work after determining that the employee is not disabled, and then discipline that employee for unexcused absences. The employer does not violate ERISA Section 510 just because a court later determines that the employer's good faith disability determination was wrong."); see also Gibbs v. BellSouth Telecomm., Inc., 459 F.Supp.2d 1133, 1140-41 (N.D. Ala. Oct. 11, 2006) (denying motion for preliminary injunction because plaintiff failed to show substantial likelihood of success on the merits of § 510 claim; plaintiff failed to demonstrate suspect motive or bad faith on part of defendant when it terminated her for failing to return to work after determining she was not disabled under STD Plan's definition); Patnaude v. Qwest Corp., No. Civ. 01-1847 JRTRLE, 2003 WL 22076564, at *6 (D. Minn. Sept. 2, 2003) ("Even if the Court agreed that [the plaintiff] was disabled under the plan, this would not be relevant to his § 510 claim.").

Even assuming Plaintiff had put forth evidence that was sufficient to create an issue of fact as to whether there was an inference of discrimination, Plaintiff has failed to establish that AT&T Corp.'s legitimate, nondiscriminatory reason for her termination – her failure to return to work after failing to timely request leave of absence – was pretextual. Contrary to Plaintiff's assertion, Defendant has not provided shifting reasons for Plaintiff's termination. Rather, Defendant's stated explanation for Plaintiff's termination has remained consistent. Plaintiff failed to timely request leave of absence pending her appeal in compliance with stated policies and was therefore, terminated for "unexcused absences, i.e., failure to substantiate or provide medical information

regarding her absence, and failure to return to work."  Further, it is Plaintiff who has

alleged shifting motivations for her termination.  Plaintiff has alleged her termination was

in retaliation for filing EEOC and FCHR claims, as well as internal complaints and

grievances, against her supervisors.[11]  To establish retaliation under § 510, Plaintiff

must demonstrate she was terminated in retaliation *for exercising ERISA rights*, not for

any of the other reasons suggested.  "In order to prevail on an ERISA interference

claim, the plaintiff must introduce, *inter alia*, evidence suggesting that interference with

her ERISA rights was a motivating factor in her termination."  Echols v. Bellsouth

Telecommunications, Inc., 385 F. App'x 959, 962 (11th Cir. 2010) (citing Clark, 990 F.2d

at 1223-24).  Although Plaintiff need not prove that retaliation for exercising her ERISA

rights was the sole reason for her discharge, she must prove that retaliation for

exercising her ERISA rights had a "determinative influence" on her employer's decision

to terminate her.  Koons v. Aventis Pharmaceuiticals, Inc., 367 F.3d 768, 777 (8th Cir.

2004) (quoting Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 141 (2000));

see also  Woodson v. Scott Paper Co., 109 F.3d 913, 935 (3d Cir. 1997).  Plaintiff has

simply failed to show that exercising her ERISA rights had a determinative influence on

the decision to terminate her employment.  See Walsh v. UPS, 201 F.3d 718, 729-30

(6th Cir. 2000) (affirming grant of summary judgment on § 510 claim where employee

was terminated for failure to respond to employer's requests for medical information

---

[11] In her petition to FCHR, Plaintiff alleged she was "terminated as a conclusion to the ongoing retaliatory harassment and unlawful retaliatory employment practices by AT&T." (Doc. 28-11 at 25).  Plaintiff alleged "AT&T engaged in a campaign of retaliatory harassment against Ms. Carter following Ms. Carter filing a charge of discrimination with the EEOC by harassing Petitioner and treating her differently . . . and ultimately terminating Ms. Carter when she had returned the required paperwork."  Id. at 26.

necessary to demonstrate entitlement to medical leave, not to avoid paying disability benefits); Brown v. BellSouth Telecomm., Inc., 73 F.Supp.2d 1308, 1324 (M.D. Fla. 1999) (granting summary judgment in plaintiff's favor with respect to LTD benefits claim but granting summary judgment in defendants' favor as to retaliation claim because plaintiff failed to demonstrate she was discharged for applying for benefits under the plan).

## VI.    CONCLUSION

Upon consideration of the administrative record, the undersigned concludes Sedgwick did not undertake the appropriate inquiry for determining whether Plaintiff was entitled to disability benefits.  Therefore, Defendant AT&T Umbrella Plan No. 1's motion should be denied, and this matter should be remanded to Defendant AT&T Umbrella Plan No. 1 for reassessment of Plaintiff's STD claim.  On remand, Defendant should determine whether Plaintiff's condition renders her unable to perform her regular job with or without accommodations, a job comparable in skills and functions to her regular job with or without accommodations, or temporary modified duties.

Additionally, for the reasons discussed above, the undersigned concludes Defendant AT&T Corp.'s motion should be granted with respect to Plaintiff's claim for retaliation because Plaintiff has failed to show her employment was terminated in retaliation for exercising her rights under the STD Plan.

Accordingly, after due consideration, it is respectfully **RECOMMENDED**:

1.  Defendant AT&T Corp.'s Motion for Summary Judgment (Doc. 27) be **GRANTED**.

2.      Defendant AT&T Umbrella Plan No. 1's Motion for  Summary Judgment or, in the Alternative, Motion for Final Judgment (Doc. 32) be **DENIED** and this matter be **REMANDED** to Defendant AT&T Umbrella Plan No. 1 for further consideration of Plaintiff's STD claim.

**DONE AND ENTERED** in Jacksonville, Florida this 16th day of January, 2014.


MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Honorable Brian J. Davis
United States District Judge

Counsel of Record